# UNITED STATES DISTRICT COURT
for the
Eastern District of California

FILED
SEP 21 2018
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

| | |
|---|---|
| United States of America<br>v.<br><br>JOHN DAVID PALMER<br><br>*Defendant* | Case No. 2:18-MJ-0190 CKD<br><br>**SEALED** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 21, 2017 through August 29, 2018 in the counties of San Joaquin and Sacramento in the Eastern District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Distribution, Possession with Intent to Distribute, and Conspiracy to Distribute Methamphetamine and Heroin, including the following: |

**Count One**: Distribution and of at least 100 grams of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about September 21, 2017;
**Count Two**: Distribution of at least 100 grams of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about June 7, 2018;
**Count Three**: Distribution of at least 100 grams of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about June 28, 2018;
**Count Four**: Distribution of at least 50 grams of methamphetamine (actual), in violation of 21 U.S.C. § 841(a)(1), on or about June 28, 2018;
**Count Five**: Distribution of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about August 24, 2018; and
**Count Six**: Distribution of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about August 29, 2018.

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

*Complainant's signature*

Brian Nehring, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/21/2018

City and state: Sacramento, CA

*Judge's signature*

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT, ARREST WARRANT, AND CRIMINAL COMPLAINT

I, Special Agent Brian Nehring of the DEA, being duly sworn, depose and state as follows:

### Background and Expertise

1. I am a Special Agent of the Drug Enforcement Administration (DEA), San Francisco Field Division, and have been so employed since 1991. I have had numerous assignments since beginning with DEA, including being assigned to the Clandestine Laboratory Enforcement Team from 1997 to 1999, the Oakland Resident Office between 1999 and 2002, and the Mobile Enforcement Team (MET) between 2002 and 2004. I have been assigned to the Sacramento Division Office since September of 2004.

2. I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal, from the Drug Enforcement Administration (DEA). In addition, I graduated from the DEA Basic Agents Academy at the FBI Academy at Quantico, Virginia. In total, I have received in excess of 500 hours of comprehensive formalized classroom instruction in those areas outlined above.

3. I have assisted in the execution of more than four hundred (400) warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia and other evidence of violations of federal drug narcotics statutes. As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the traffickers' effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain. I have been actively involved as case agent in excess of two hundred (200) investigations and have talked with confidential informants involved in the trafficking of narcotics, and this has formed the basis of my opinions.

4. I have been qualified as and have testified as an expert witness in both federal and state court in the Northern and Eastern Districts of California and in counties including Alameda, Contra Costa, Solano, Sacramento and others. These areas of qualification have included possession for sale, possession with intent to distribute, manufacturing of a controlled substance and cultivation.

1

## Scope of Requested Criminal Complaint and Search Warrant

5. This Affidavit is submitted in support of a Criminal Complaint charging **John David PALMER** with distribution and conspiracy to distribute and possession with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and at least 50 grams of methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 846 and 841(a)(1).

6. This Affidavit is also submitted in support of a search warrant to search the following locations:

    A. The current residence of PALMER, located at **18371 Brandt Road, Lodi, California;**

    B. The **black 2010 Chevrolet truck, California License #31528X1**;

    C. The person of **John David PALMER**;

    D. The person of **Holly GARREN**;

    E. The T-Mobile prepaid cellular telephone with call number **(916) 821-1947** used by PALMER; and

    F. The Sprint cellular telephone with call number **(209) 224-6912**, initiated July 3, 2018, used by and subscribed to Holly GARREN, with ESN 256691624200168007.

7. I believe that John David PALMER is a large-scale heroin and methamphetamine trafficker currently operating within the Eastern of California. Based upon the ongoing federal investigation detailed below, I believe that PALMER has been distributing large amounts of heroin and methamphetamine in the Eastern District of California throughout 2017 and 2018 and that he has been supplying individuals transporting drugs to other states during this same time period. I also believe that PALMER has been assisted in this endeavor by his common-law wife, Holly GARREN. This Affidavit therefore requests authority to search the locations described in Attachment A in order to located and seize the items described in Attachment B as evidence and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution or and possession with intent to distribute heroin and methamphetamine), and 21 U.S.C. §§ 846 and 841(a)(1) (conspiracy to distribute and possess with intent to distribute heroin and methamphetamine).

### Charges Sought for the Criminal Complaint and Arrest Warrant

8. **Count One:** Distribution and of at least 100 grams of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about September 21, 2017;

9. **Count Two:** Distribution of at least 100 grams of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about June 7, 2018;

10. **Count Three:** Distribution of at least 100 grams of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about June 28, 2018;

11. **Count Four:** Distribution of at least 50 grams of methamphetamine (actual), in violation of 21 U.S.C. § 841(a)(1), on or about June 28, 2018;

12. **Count Five:** Distribution of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about August 24, 2018; and

13. **Count Six:** Distribution of heroin, in violation of 21 U.S.C. § 841(a)(1), on or about August 29, 2018.

### Probable Cause

*Background*

14. Beginning in late 2016, I spoke with a Confidential Source, hereinafter referred to as the CS, regarding the heroin and methamphetamine trafficking activities of an individual identified as **John David PALMER**.

15. At this time the CS was providing me with information solely in hopes of receiving financial compensation. The CS has an extensive criminal history including felony convictions for Possession of a Controlled Substance for Sale, Felon in Possession of a Firearm, and other offenses. The CS has in the past provided me and other law enforcement agencies with information and assistance when he/she had a particular pending drug case, and as a result of that assistance the CS received consideration from the prosecutor in that case in return for his/her assistance. The CS's information and assistance was previously independently corroborated in the prior investigations and was used in a prosecution that led to a felony conviction. I have never found the CS to be false or misleading, and the CS's descriptions of drug and drug dealing have been entirely consistent with my own training and experience in this area. The CS's assistance and information has been incorporated in federal search warrants, including search warrants for Precise Location Data for Cellular Telephones, which has led to the seizure of multiple pounds of drugs. For these reasons I consider the CS reliable.

16. The CS related that he/she had known PALMER for many years and that he/she had obtained multiple pounds of methamphetamine from PALMER in the past. The CS stated that PALMER was allegedly currently supplying numerous people the CS knew in San Joaquin County with methamphetamine and heroin, and that multiple individuals had indicated he was sending large amounts of methamphetamine and heroin to customers outside of California. The CS identified a California DMV driver's license photograph of PALMER. The CS stated that in early 2017, PALMER claimed to be living on a ranch near Lockeford, California.

17. I subsequently learned through NCIC inquiries that PALMER has an extensive criminal history including multiple felony convictions in California for offenses including Possession of a Controlled Substance for Sale, Felon with a Firearm, and others for which he has been committed to state prison multiple times. I also learned that PALMER provided information to law enforcement for consideration in one of his state narcotics cases. The period of his cooperation with law enforcement was from March 28, 2007 to July 9, 2007.

*September 2017 Transaction*

18. The CS provided me the contact information for PALMER and introduced PALMER to me. In September 2017, I contacted PALMER directly. During a series of recorded telephone calls and text messages, I arranged with PALMER to purchase five ounces of heroin for $3500.00 on **September 21, 2017** at a McDonalds Restaurant in Galt, California. I subsequently met with PALMER, who arrived in a **black 2010 Chevrolet truck, California License #31528X1**. I met with him at the passenger side of the vehicle and purchased the heroin (**174 gg**) for the agreed $3500.00. This heroin was subsequently analyzed by the DEA Western Regional Laboratory and determined to be **118 actual grams of heroin**.

*Out-of-State SOI*

19. In late 2017 and early 2018, multiple individuals were arrested on state and federal narcotics charges in California and outside California. PALMER was identified as the source of these drugs based upon toll analysis of PALMER's known telephones, toll analysis of the arrested individual's telephones, and the arrested individuals' statements. The CS stated that PALMER became exceedingly paranoid that he was going to be arrested on federal drug charges as the result of all these arrests, and for a time he virtually disappeared. The CS was informed that PALMER was still living on his ranch outside of Lodi during this timeframe.

20. In late 2017, I participated in a proffer interview of an individual who was incarcerated in a state outside of California on federal drug charges as the result of an arrest for multiple pounds of drugs in that state. Prior to that individual's arrest, I had been alerted that he/she was the subject of an ongoing investigation and that his/her identified telephone number was in high-frequency contact with PALMER's

4

telephone number at the time. Prior to his/her arrest, this individual had been followed by DEA agents from another state to Stockton, California, where he/she was observed at a hotel. Agents inform me that this individual was observed meeting with a blond white female adult at this hotel. This individual was later followed by agents back to his/her own state, where he/she was stopped after crossing the state line and found to be in possession of multiple pounds of drugs, to include methamphetamine and heroin. The individual, hereinafter referred to as the Source of Information (SOI), provided the following information in hopes of receiving consideration in those pending charges.

21. The SOI stated that he/she had obtained multiple pounds of methamphetamine and heroin from PALMER since 2016. The SOI identified a photograph of PALMER. The SOI also identified the property located at **18371 Brandt Road, Lodi, California** from a satellite photograph as the property where PALMER lived with his girlfriend, Holly, whom the SOI identified from a DMV driver's license photograph as Holly GARREN. The SOI stated that during their association, PALMER would sometimes direct the SOI to come directly to his property to pick up the drugs or occasionally would direct the SOI to get a hotel room nearby to wait for the drugs to be delivered. While at the property, the SOI routinely observed large amounts of methamphetamine and heroin as well as multiple firearms. The SOI stated that GARREN was actively involved in PALMER's ongoing drug trafficking and would often deliver the drugs or pick up the money on PALMER's behalf. The SOI also stated that GARREN had been the individual who delivered the drugs to the SOI at the hotel in Stockton that was later found in the SOI's possession when the SOI was arrested.

22. In late May 2018, the CS indicated that a mutual associate of the CS and PALMER provided 209-992-2585 as PALMER's new cellphone number at which he could be contacted to obtain methamphetamine and heroin.

23. Inquiries with the Sprint Corporation revealed that the account for 209-992-2585 was initiated on May 14, 2018, in the name of Dave MANNING at 7632 Pool Station Road, Angels Camp, California. Analysis of the tolls for this phone showed that its calling pattern closely matched the calling patterns of the previous telephones that PALMER was identified as using. Its most frequently-contacted number was the number identified as used by PALMER's girlfriend, Holly GARREN. It also shared 16 mutual contacts with the last telephone PALMER used in September 2017 when I had purchased the heroin from him described above.

### *2018 Transactions*

24. In early June 2018, I telephonically contacted PALMER, and during recorded calls, re-established contact and requested to purchase additional heroin. PALMER indicated he still had access to large amounts of heroin for $700 per ounce. I subsequently arranged during recorded calls and text messages with PALMER to purchase approximately nine ounces of heroin on **June 7, 2018**. We agreed to meet

5

at the Coyotes Mexican Restaurant in Lodi, California. That day, agents had established surveillance at PALMER's rural property at **18371 Brandt Road** south of Lockeford. At approximately 1:52 p.m., PALMER was followed from his property on Brandt Road directly to the Coyotes Restaurant in Lockeford where he arrived at 1:57 p.m. and sold me **432 gg of heroin** for $6000.00. This heroin was subsequently analyzed by the DEA Western Regional Laboratory and found to be **353 actual grams of heroin**. PALMER told me he had just paid $5500 for the heroin. PALMER also related to me that he also currently had many pounds of methamphetamine that he was selling for $2500 per pound and he displayed a bag containing a large amount of methamphetamine and gave me an approximately 8-gram free sample. PALMER was then followed back to his rural property at **18371 Brandt Road, Lodi, California**, where he arrived at 2:11 p.m.

25. I was subsequently informed by the Forensic Fingerprint Examiner at the Western Regional Laboratory that two fingerprints suitable for comparison were developed on the vacuum sealed bag which contained the 353 grams of heroin that I purchased from PALMER on June 7, 2018. One of these fingerprints was identified to a known fingerprint card for Holly GARREN.

26. During late June 2018, I spoke with PALMER. During recorded narcotics related calls and text messages, I arranged to meet with PALMER on **June 28, 2018** to purchase an additional eight ounces of heroin. We again agreed to meet at the Coyote's Restaurant in Lockeford, California. That morning, agents observed PALMER arrive at his property at **18371 Brandt Road** driving the same black **2014 Chevrolet truck**. At approximately 12:12 p.m., I called PALMER and advised him that I had arrived at the Coyote's Restaurant parking lot in Lockeford. PALMER stated that the heroin had arrived and that he would leave his property and be there shortly. Agents subsequently observed PALMER leave the property alone in the black Chevrolet truck and travel directly to my location where he met me and sold me approximately **292 gg of suspected heroin and 89 gg of suspected methamphetamine** for $6500.00. After this transaction, PALMER was followed directly back to the property at **18371 Brandt Road**. These items were subsequently analyzed by the DEA Western Regional Laboratory as being **210 actual grams of heroin and 56.7 grams (55 grams actual) methamphetamine**.

27. In August 2018, I engaged in recorded narcotics related calls and text messages with PALMER at 209-992-2585 arranging to purchase nine ounces of heroin on August 24, 2018. On August 23, 2018, after missing a call from the number **209-224-6912**, I received a series of text messages to include the following: `Yes we'll I'm his girlfriend…He was using my phone earlier and said to let you know everything's ready for tomorrow…I was however half asleep when he left. you can call his #;` and `I know tomorrows good for sure just not 100 surre ther wasn't more to relay than that I'll have him hit you up when he comes back tho.` This number was the highest frequently called number by

6

PALMER's telephone and was identified as a cellular telephone used by Holly GARREN and registered to Holly GARREN.

28. On **August 24, 2018**, PALMER requested that I meet him at the Arco Station at 2423 Highway 99 N. Frontage Road, Acampo at the Highway 99 exit to conduct the transaction. I arrived at this location. PALMER arrived shortly thereafter and sold me the initial nine ounces of suspected **heroin, 360 gross grams**, for $6000.00. I told PALMER that I had additional money to buy more heroin if he had it with him. He told me he would check, then went back to his truck and informed me he had a little less than an ounce and a half left, which he would sell me for $600. I gave him the $600 in exchange for the extra heroin, which weighed **84.7 gross grams**. I told him I might have more money that afternoon. PALMER responded that he was going to be seeing his heroin source to obtain more heroin that same day and to call him. Following this exchange, PALMER was followed away by agents conducting surveillance to include a Homeland Security Investigations (HSI) air unit and Placer County officers providing surveillance assistance.

29. I was contacted by PALMER later that same day. During this call PALMER related that he had a friend who had monitored a law enforcement scanner and who had informed PALMER that a Police Helicopter had followed PALMER away from the site of our meeting, and that based upon the locations identified on the scanner, PALMER was certain that the helicopter had been following him. During subsequent calls, PALMER related that Placer County officers had followed me to the meeting and had followed PALMER away and he was certain that I was under investigation by law enforcement and had led them to him and I should take precautions.

30. PALMER subsequently agreed to meet me a few days later on **August 29, 2018**, in Elk Grove, California to provide me with an additional 4 ½ ounces of heroin for $2900 at the UPS Store on Calvine Road. PALMER arrived as the passenger in a vehicle I had not seen before, driven by an elderly white male. He walked around the parking lot for an extended period of time looking into different windows of vehicles and scanning the lot before finally walking up to me and requesting that I meet him at any other nearby location as he feared law enforcement surveillance. We agreed to meet at a nearby Chevron Gas Station and both drove to that location where PALMER gave me **175 gg of suspected heroin**. During this transaction, PALMER told me that he knew for sure that an HSI helicopter had followed me to the meet with him on August 24, 2018 and had followed him away because he had used an App on his phone that identified every aircraft in flight and the path of those aircrafts. He displayed this App to me. PALMER told me that another helicopter had been above him before he left to come meet me that day and he had therefore turned his phone off and that I was under law enforcement investigation and should take precautions in the future. I noted that the previously obtained GPS phone locater order which allowed me to see the location of PALMER's telephone at the time (209-992-2585) showed that the phone was turned off earlier in the day on August 29, 2018, has not been turned on since.

7

31. Analysis of the tolls for GARREN's identified telephone showed since August 27, 2018, her top contact has been **916-821-1947,** a T-Mobile pre-paid number. A common call analysis between this number and PALMER's previous number (209-922-2585) showed at least 22 common contacts between the two numbers, including likely relatives of PALMER's (also named PALMER) who have long been in contact with PALMER across most of his previously identified telephone numbers. This new phone number was initiated on August 24, 2018, the same day I purchased the 445 gross grams of heroin from PALMER in Acampo and prior to PALMER contacting me and advising me he had been followed away by a Police helicopter. I noted that PALMER had delivered the initial nine ounces to me that day in a pre-paid cellular telephone box. Based on this information, I believe that **916-821-1947** is John David PALMER's new cellular telephone number.

### *Training and Experience Regarding Drug Trafficking and Drug Traffickers*

32. As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

33. Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically traffickers keep records of those registrations and transactions in their residence.

34. I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

35. In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

36. In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, heroin and methamphetamine, which they intend to distribute. It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

37. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

38. In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

39. In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other then themselves in an effort to avoid detection by law enforcement.

40. In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

41. In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

9

42. Individuals involved in the distribution of heroin and methamphetamine often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their methamphetamine distribution, use, possession, or any other activities surrounding their cocaine and methamphetamine trafficking activities, and that such items often identify co-conspirators in their methamphetamine trafficking activities.

43. It has been my experience in the past, and particularly in this case, that when suspects use mobile telephones to communicate with cooperating individuals or undercover agents to set up the methamphetamine deals, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the drug traffickers in this case have made extensive use of text messaging to communicate about his ongoing drug trafficking. I noted that there were numerous apparent "Short Message System," or "SMS," 0 second calls recorded per telephone records between PALMER and GARREN, indicative of text message communication, and that I had engaged in narcotics related text messages with PALMER and GARREN as well.

44. I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

45. As described above and in **Attachment A**, this Affidavit seeks permission to search and seize things that are related to the ongoing heroin and methamphetamine,

conspiracy between PALMER and GARREN, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

46. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in **Attachment B** are items most often associated with the distribution of controlled substances, including heroin and methamphetamine as well as the proceeds from such illegal operations.

47. The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

48. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in **Attachment B**. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in **Attachment B** to this Affidavit and incorporated here by reference.

## Conclusion

49. The facts set forth in this Affidavit demonstrate probable cause to believe that the locations listed in **Attachment A** to this Affidavit contains evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, **John David PALMER and his co-conspirators** and their ongoing collective effort to distribute and possess with intent to distribute heroin and methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1).

50. Also, I respectfully request authority to search:

    A. The current residence of PALMER located at **18371 Brandt Road, Lodi, California;**

    B. The red **black 2010 Chevrolet truck, California License #31528X1;**

    C.    The person of **John David PALMER**;

    D.    The person of **Holly GARREN**;

    E.    The T-Mobile prepaid cellular telephone with call number **(916) 821-1947** used by PALMER; and

    F.    The Sprint cellular telephone with call number **(209)224-6912**, initiated July 3, 2018, used by and subscribed to Holly GARREN, with ESN 256691624200168007.

51. I further request that based upon this Affidavit, a Criminal Complaint and arrest warrant be issued for **PALMER**, charging him with distribution and conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 50 grams of methamphetamine (actual), a Schedule II Controlled Substance, in violation of 21 U.S.C. § 846 and 841(a)(1).

*[Continued on the next page.]*

52. Finally, I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, search warrant, arrest warrant, and Criminal Complaint. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into criminal activities by the Defendant and his coconspirators. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants over the internet, and disseminate them to other criminals as they deem appropriate, *i.e.*, post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, as well as endanger the safety of agents serving the warrant requested.

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

_____
Brian Nehring, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before
me on the 21 day of September 2018

_____
CAROLYN C. DELANEY
United States Magistrate Judge

Approved as to form:

_____
Cameron L. Desmond
Assistant U.S. Attorney

## Attachment A
## Locations to be Searched

A. The current residence of PALMER located at **18371 Brandt Road, Lodi, California,** further described as a 30 acre parcel, San Joaquin County APN #019-200-22, located at the north east intersection of Brandt Road and Atkins Road in rural San Joaquin County, accessed by the first gate on the north side of Brand Road just east of the intersection of Atkins Road, a green pipe gate with a green placard affixed displaying the numbers 18371 in white, with a driveway running north to two side-by-side mobile homes, one white and one cream colored, and all other outbuildings, sheds, storage facilities, and trailers on the property.

B. The **black 2010 Chevrolet truck, California License #31528X1**;

C. The person of **John David PALMER,** white male adult, DOB: 02-02-1970, California driver's license number #A1868796;

D. The person of **Holly Lynn GARREN,** white female adult, DOB: 05-22-1981, California driver's license number #B8229296;

E. The T-Mobile prepaid cellular telephone with call number **(916) 821-1947**; and

F. The Sprint cellular telephone with call number **(209) 224-6912** and ESN 256691624200168007.

1

## Attachment B
## Items to be Seized

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by PALMER and his co-conspirators:

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Methamphetamine.

- Title 21 U.S.C. Section 841(a)(1) – Distribution and Possession with Intent to Distribute Heroin and Methamphetamine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including heroin and methamphetamine, or items frequently used to distribute heroin and methamphetamine, or items containing residue from the distribution of heroin and methamphetamine; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase heroin and methamphetamine, from PALMER during in this investigation;

3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected

to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person, including PALMER;

11. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

12. All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with PALMER during execution of the warrant. This authority to search such mobile telephones includes the following within each mobile telephone:

   A. Incoming call history;
   B. Outgoing call history;
   C. Missed call history;
   D. Outgoing text messages;
   E. Incoming text messages;
   F. Draft text messages;
   G. Telephone book;
   H. Data screen or file identifying the telephone number associated with the mobile telephone searched;
   I. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
   J. Voicemail;

K.  User-entered messages (such as to-do lists);
L.  Photographs; and
M.  Any passwords used to access the electronic data described above.